METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff and Counterdefendant-Appellant, v. AMERICAN NATIONAL BANK AND TRUST COMPANY, as Trustee, *et al.*, Defendants (Bank One Chicago, N.A., Successor by Merger with Bank One, LaGrange, f/k/a First Illinois Bank and Trust, Defendant and Counterplaintiff Intervenor-Appellee).

First District (5th Division)   No. 1—96—1356

Opinion filed May 2, 1997.

Timothy J. Patenode and Thomas J. Meier, both of Katten, Muchin & Zavis, of Chicago, for appellant.

Paul M. Bauch and Edwin J. Reisinger, both of Bell, Boyd & Lloyd, and Laurie K. Breitenstein, of Bank One Illinois Corporation, both of Chicago, for appellee.

JUSTICE SOUTH delivered the opinion of the court:

Appellant, Metropolitan Life Insurance Company (Met Life), appeals from an order of the circuit court of Cook County denying its cross-motion for summary judgment and granting appellee's, Bank One Chicago, N.A. (Bank One's), motion for summary judgment.

On September 19, 1980, Met Life loaned $13,500,000 to the American National Bank and Trust Company of Chicago (Trustee). At that

time, the Trustee held legal title to the real property, buildings and improvements now commonly known as the Woodfield Hilton Hotel, a 452-room hotel located at 3400 West Euclid Avenue, Arlington Heights, Illinois (the Hotel). George J. Ablah (Ablah) and the Magnum Hotel Corporation (Magnum) owned the beneficial interest in the land trust.

To secure the promissory note evidencing the loan, the Trustee executed a mortgage, assignment of rents, security agreement and Uniform Commercial Code (UCC-1) financing statement. To further secure the promissory note, Ablah and Magnum executed a security agreement. The security agreement granted Met Life a security interest in the hotel's existing and after-acquired furniture and equipment (F&E). Met Life perfected its security interest in the hotel F&E by filing UCC-1 financing statements with the Illinois Secretary of State's office.

On or about May 3, 1985, Ablah and Magnum entered into an agreement to sell the hotel real property and personalty to USW Arlington Hotel Corporation (USW). On or about June 25, 1985, the sale agreement was amended to provide for the transfer of the hotel F&E to the Magnum Hotel Trust (Grantor Trust).

Pursuant to the parties' security agreement, Ablah and Magnum had to obtain Met Life's authorization before the hotel could be sold. On June 28, 1985, after review of the sale agreement, Met Life consented to the sale by letter. On or about July 1, 1985, USW closed the purchase of the hotel, thereby acquiring ownership of the hotel real property and the hotel F&E. Subsequent to the sale, nearly all of the transferred F&E was replaced.

In February of 1987, USW established a $500,000 revolving line of credit with Bank One's predecessor, First Illinois Bank & Trust (First Bank), to cover taxes and insurance payments. To secure its obligations to First Bank, USW executed a series of security agreements granting First Bank a security interest in the hotel F&E.

On or about March 22, 1988, USW revoked and terminated the Grantor Trust and distributed the hotel F&E to the Woodfield Hotel Limited Partnership (the Partnership), its sole shareholder. USW then filed articles of dissolution, dissolving itself as a corporation.

Between 1990 and 1992, First Bank became Bank One. Bank One subsequently made new loans to the Partnership and required the Partnership to execute new security agreements. The last security agreement was executed on February 1, 1990. The 1990 security agreement granted Bank One a security interest in existing and after-acquired F&E. Bank One perfected its security interest by filing a UCC-1 financing statement on March 7, 1990.

In August of 1992, Bank One extended to the Partnership a new $500,000 revolving line of credit. To evidence the loan, the parties executed a business-purpose revolving promissory note (Promissory Note), a business loan agreement, a borrowing base addendum and a UCC-1 financing statement. Although the 1992 promissory note made reference to a 1992 security agreement, Bank One and the Partnership failed to execute a 1992 security agreement.

On December 1, 1992, the Partnership defaulted under Met Life's mortgage. On January 20, 1993, Met Life filed a complaint to foreclose its mortgage against the hotel's real property and personalty. On February 2, 1993, the Partnership stipulated to the entry of a decree of foreclosure and sale of the hotel real property and personalty.

On or about March 1, 1993, the Partnership defaulted under Bank One's 1992 promissory note. On March 25, 1993, Bank One moved to intervene in Met Life's foreclosure action. Upon intervention, Bank One filed a counterclaim asserting a prior security interest in the hotel F&E, and it requested the court to award Bank One the proceeds from the sale of the hotel F&E.

By agreement between Met Life and Bank One, the circuit court entered an order on April 1, 1993, that $500,000 of the proceeds from the sale of the hotel F&E shall be reserved for later determination of the validity and relative priority of the parties' liens. Thereafter, Met Life filed an amended complaint asking the circuit court to declare that its security interest in the hotel F&E was superior to Bank One's and to order the turnover of the proceeds to Met Life. On April 6, 1993, Met Life purchased the hotel at public auction.

On October 18, 1995, Bank One filed a motion for summary judgment pursuant to section 2—1005(c) (735 ILCS 5/2—1005(c) (West 1994)). On December 13, 1995, Met Life filed a response to Bank One's motion and cross-motioned for summary judgment. On January 4, 1996, Bank One filed its reply to Met Life's response and cross-motion. On March 6, 1996, the circuit court granted Bank One's motion for summary judgment, denied Met Life's motion for summary judgment, and ordered Met Life to pay Bank One the $500,000 in proceeds reserved from the foreclosure sale of the hotel F&E.

In denying Met Life's motion for summary judgment, the circuit court found that Met Life acquired a valid perfected security interest in the hotel F&E of the original owners, Ablah and Magnum. Nevertheless, Met Life lost its security interest when it consented to the transfer of the F&E to USW, through the Grantor Trust, in the consent letter. The circuit court found that it was not disputed that Met Life failed to obtain a new security agreement and file a new

financing statement after the transfer of the hotel F&E. The circuit court also noted that since nearly all of the transferred F&E was replaced after 1985, it was impossible for Met Life to currently have an interest in the after-acquired F&E.

In granting Bank One's motion for summary judgment, the circuit court found that although Bank One and the Partnership failed to execute a new security agreement in 1992, Bank One maintained a perfected security interest in the hotel F&E pursuant to its 1990 security agreement's dragnet clause. The circuit court found that the 1990 security agreement's dragnet clause remained in force because Bank One did not receive written notice of termination from the Partnership. Met Life appeals. We affirm in part, and reverse in part.

## OPINION

■ As a preliminary matter, Bank One has requested that this court take judicial notice that Bank One has obtained a money judgment against the Partnership and that Bank One has a judgment lien upon the Partnership's assets. On August 27, 1996, Bank One filed a complaint against the Partnership alleging that the Partnership owed Bank One $450,000 and interest totaling $151,527.54 and further interest accruing at a *per diem* rate of $153.13. On November 13, 1996, a consent order was entered in the circuit court of Cook County in favor of Bank One and against the Partnership in the amount of $610,102.82.

This court may take judicial notice of public documents that are included in the records of other courts. *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 622 N.E.2d 123 (1993). Accordingly, Bank One's request that we take judicial notice that Bank One has obtained a money judgment against the Partnership and that Bank One has a judgment lien upon the Partnership's assets is granted.

■ Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1994). Summary judgment is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt the movant's right to relief. *Signal Capital Corp. v. Lake Shore National Bank*, 273 Ill. App. 3d 761, 652 N.E.2d 1364 (1995). Summary judgment is particularly appropriate where all parties file for summary judgment. *Signal*, 273 Ill. App. 3d 761, 652 N.E.2d 1364. This court

reviews the propriety of an order granting summary judgment *de novo*, independent of the circuit court's reasoning on the issues presented. *Pagano v. Occidental Chemical Corp.*, 257 Ill. App. 3d 905, 629 N.E.2d 569 (1994). "If, from a review of the pleadings and evidentiary material before the [circuit] court, [this court] determines that a material issue of fact exists or that the summary judgment was based upon an erroneous interpretation of the law, a reversal is warranted." *Pagano*, 257 Ill. App. 3d at 909, 629 N.E.2d at 572.

Met Life contends that it retained its security interest in the existing and after-acquired hotel F&E after consenting to the 1985 sale of the hotel and that an issue of fact exists as to whether Met Life intended its consent to the 1985 sale to relinquish its interest in the hotel F&E. In support of this contention, Met Life argues that nowhere in the letter did it clearly and unambiguously authorize disposition of the collateral "free and clear" of its interest in the hotel F&E and that, in 1985 and 1990, it filed UCC continuations of the 1980 UCC financing statements executed by the Trustee, Ablah and Magnum, indicating Met Life's intention to maintain its security interest in the hotel F&E.

■ Section 9—306(2) of the UCC provides: "Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless* the disposition was authorized by the secured party in the security agreement or otherwise ***." (Emphasis added.) 810 ILCS 5/9—306(2) (West 1994).

Met Life's June 28, 1985, consent letter stated in relevant part:

"Reference is hereby made to that certain Purchase and Sale Agreement dated as of May 3, 1985 by and among Ablah, Magnum (seller) and USW (purchaser) and the certain Amendment executed by the same parties as of June 25, 1985, copies of which documents we have received. We acknowledge that under the Agreement, seller and Ablah will assign to Purchaser the beneficial interests under a land trust and a grantor trust, the assets of which trusts collectively constitute the Arlington Park Hilton (the Hotel) located in Arlington Park, Illinois. After the closing under the Agreement, purchaser, as the beneficiary of the grantor trust, could cause the assets of the grantor trust to be transferred to purchaser and cause the grantor trust to terminate. The Hotel is subject to a mortgage in favor of the undersigned, recorded October 8, 1980 with the recorder of Deeds of Cook County, Illinois, as document No. 25616211, which Mortgage shall remain in place notwithstanding the consummation of the transactions described above.

Please be advised that Metropolitan Life Insurance Company

hereby consents to the transactions described in the Agreement and, if Purchaser subsequently elects to terminate the grantor trust, Metropolitan Life Insurance Company agrees to consent to the transfer of the assets of the grantor trust to Purchaser."

The sale agreement provided that the assets being sold would be "free and clear" of all liens and other encumbrances excluding permitted title exceptions. Met Life reviewed the sale agreement and forwarded its letter of consent thereto. The permitted title exceptions included Met Life's mortgage lien on the real property and Met Life's security interest in certain real fixtures. However, the title exceptions did not include Met Life's interest in the hotel F&E. Therefore, Met Life lost its security interest pursuant to section 9—306(2) (810 ILCS 5/9—306(2) (West 1994)) and was required to recreate its security interest in the hotel F&E under section 9—203 (810 ILCS 5/9—203 (West 1994)).

■ The requirements for the creation of a security interest by a debtor in favor of his creditor are that: (1) the debtor must have or acquire rights in the collateral; (2) the creditor must give value to the debtor; (3) the creditor and the debtor must agree that a security interest shall attach to the collateral; and (4) either the collateral must be in the possession of the creditor or there must be a written security agreement signed by the debtor that contains a description of the collateral. 810 ILCS 5/9—203 (West 1994); *Voutiritsas v. Intercounty Title Co.*, 279 Ill. App. 3d 170, 664 N.E.2d 170 (1996). Met Life held a valid perfected security interest in the existing and after-acquired F&E when it made its loan to the hotel trustee in 1980. However, after consenting to the transfer of the F&E by the hotel to the USW Grantor Trust, in the letter dated June 28, 1985, Met Life lost its security interest in the hotel F&E and, thereafter, failed to satisfy the requirements under section 9—203 (810 ILCS 5/9—203 (West 1994)) to recreate its security interest.

Furthermore, "[w]here the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than 4 months after the change, unless a new appropriate financing statement is filed before the expiration of that time." 810 ILCS 5/9—402(7) (West 1994).

■ Here, notwithstanding Met Life's knowledge of and consent to the 1985 sale and transfer of the hotel F&E, Met Life did not require either USW or the Grantor Trust to execute a new security agreement or UCC-1 financing statement relating to the hotel F&E. Accordingly, the circuit court's order denying Met Life's motion for summary judgment was proper.

Met Life contends that the circuit court erred in finding that Bank One had a perfected security interest in the hotel's F&E. Met Life reasons that despite the fact that the business loan agreement between Bank One and the Partnership is not labeled "security agreement," under the UCC, the business loan agreement is a valid security agreement. Met Life argues that the 1992 business loan agreement clearly describes Bank One's collateral as accounts receivable only, not F&E. Met Life posits that this agreement superseded and terminated the 1990 security agreement's dragnet clause. Therefore, Met Life concludes, the Partnership did not provide Bank One a perfected security interest in the hotel F&E.

Bank One contends that it has a perfected security interest in the hotel F&E. Bank One reasons that it inadvertently failed to execute a new security agreement in 1992. However, Bank One argues that the dragnet clause in its 1990 security agreement granted Bank One a continuing perfected security interest in the existing and after-acquired hotel F&E. In support of its position, Bank One cites *In re Kazmierczak*, 24 F.3d 1020 (7th Cir. 1994). In *Kazmierczak*, the court held that the fact "that the parties had intended to execute a fresh security agreement every year [ ] has no weight at all. The 'future debts' clause was a hedge against their failing to do so. They could of course have canceled it by mutual consent." *Kazmierczak*, 24 F.3d 1021.

Dragnet clauses are specifically authorized by section 9—204(3) (810 ILCS 5/9—204(3) (West 1994)) of the UCC, which provides:

> "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment ***." 810 ILCS 5/9—204(3) (West 1994).

In *Stannish v. Community Bank*, 24 B.R. 761 (N.D. Ill. 1982), the bankruptcy court had occasion to examine the enforceability of dragnet clauses under Illinois law. In that opinion, the bankruptcy court indicated that although dragnet clauses are not favored under Illinois law, they will be upheld where no ambiguity exists and will be interpreted according to the language used. Some courts in other states impose a relatedness test to determine whether future advances are covered. Those courts have stated that future advances, to be covered, must be of the same class as the primary obligation and so related to it that the debtor's consent to its inclusion may be inferred. *In re Hunter*, 68 B.R. 366 (C.D. Ill. 1986). As noted in *Hunter*, however, Illinois law does not follow this view.

In determining that Bank One possessed a perfected security interest in the hotel F&E, the circuit court found that Bank One did

not receive written notice of termination and, therefore, the 1990 security agreement's dragnet clause remained in effect. We disagree.

■ In general, a security agreement is effective according to its terms between the parties (810 ILCS 5/9—201 (West 1994)). The 1990 security agreement's dragnet clause stated:

> "As security for the performance and payment of all of Borrower's liabilities to Bank, including performance of the terms and provisions of any applicable Loan Agreement between Borrower and Bank, Borrower hereby pledges, assigns, transfers, delivers and grants Bank a continuing security interest in the hotel F&E to secure 'any and all liabilities, obligations, indebtedness and contractual duties of every kind and nature of the Borrower now and hereinafter existing.'"

The 1990 security agreement's termination clause stated:

> "This agreement shall remain and continue in full force and effect (notwithstanding the non-existence at any time of any Liabilities secured or intended to be secured hereby) unless and until such time as the Bank shall have received from Borrower at Bank's main office written notice of the termination of this agreement."

■ Notwithstanding the fact that the 1990 security agreement's dragnet clause granted Bank One a continuing security interest in the hotel F&E to secure future obligations, an ambiguity exists between the 1990 dragnet clause and the documents executed when the Partnership incurred the $500,000 obligation in 1992. In addition, the conditions of the 1990 security agreement's termination clause were satisfied, thereby rendering the 1990 security agreement's dragnet clause ineffective.

In the 1992 promissory note, Bank One made reference to a security agreement "covering accounts receivable." In the 1992 business loan agreement, although there is a designated space to check the hotel F&E as collateral, Bank One elected not to check this space. Bank One checked only accounts, general intangibles, and other forms of obligations and receivables. In the 1992 borrowing base addendum, although there is a designated space to check equipment, Bank One elected not to check this space. Bank One checked only "accounts receivable up to a maximum of $500,000," the entire amount of the 1992 loan. In the 1992 UCC-1 financing statement, Bank One made reference to a security agreement "covering accounts receivable." The 1992 documents consistently made reference only to accounts receivable as security for the 1992 loan. Hence, an ambiguity exists as to whether the Partnership intended to secure the 1992 loan with accounts receivable only or with both accounts receivable and the hotel F&E.

Moreover, the record shows that the Partnership's prior promissory note was paid in full, and that Bank One and the Partnership terminated the 1990 security agreement by mutual consent when they executed the 1992 business loan agreement. The 1992 business loan agreement precisely and unambiguously provided:

"[T]his agreement contains the entire agreement of the parties *and supersedes all prior agreements and understandings*, oral or written, with respect to the subject matter hereof." (Emphasis added.)

There is no dispute that the subject matter in the 1992 business loan agreement was the terms and conditions for the $500,000 loan provided the Partnership by Bank One in 1992.

It is well established that contracts are construed against the drafter. *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 505 N.E.2d 314 (1987). The 1992 documents were drafted by Bank One. Bank One cannot now posit that its drafting and execution of the precise and unambiguous language that the 1992 business loan agreement "supersede all prior agreements and understandings" is to have no legal force and effect.

Had Bank One wanted to perfect a security interest in the hotel F&E, it would have been a simple matter to add to the 1992 documents a reference to the hotel F&E and to incorporate the 1990 security agreement. To the contrary, Bank One drafted and executed explicit language superseding all prior agreements, thereby rendering the 1990 security agreement ineffective. "Moreover, banks can easily avoid such potential losses of collateral by careful drafting, and we see no good reason to apply unjustifiably loose constructions to documents of this kind." See *In re Schmaling*, 783 F.2d 680 (7th Cir. 1986).

As there is an ambiguity between the 1990 security agreement's dragnet clause and the 1992 documents that refer only to accounts receivable, and considering the fact that Bank One and the Partnership terminated the 1990 security agreement by mutual consent when they executed the 1992 business loan agreement, the 1990 dragnet clause was not effective under section 9—204 (810 ILCS 5/9—204 (West 1994)) to create a security interest in the hotel F&E as security for the 1992 loan.

In light of the foregoing, summary judgment that the 1990 security agreement's dragnet clause provided Bank One a perfected security interest in the hotel F&E, as security for the 1992 loan, cannot be upheld.

Accordingly, the order of the circuit court denying Met Life's mo-

tion for summary judgment is affirmed, and the order of the circuit court granting Bank One's motion for summary judgment is reversed.

Affirmed in part and reversed in part.

HARTMAN, P.J., and HOURIHANE, J., concur.